UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LEWIS AND CLARK BANK, an Oregon state chartered bank,

Plaintiff,

v.

STEWART TITLE GUARANTY COMPANY, a Texas corporation,

Defendant.

Case No.: 3:11-CV-848-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Lewis and Clark Bank (the "Bank") filed this action for breach of a Policy of Title Insurance, Policy # M-7991-1338 (the "Policy"), issued to it by defendant Stewart Title Guaranty Company ("Stewart Title"). Stewart Title moves for summary judgment arguing the Bank has

already received everything it is entitled to under the Policy. The Bank contends Stewart Title is obligated to pay $250,000 for lost profits caused by Stewart Title's failure to timely accomplish its obligations under the Policy, and for the Bank's attorney fees under OR. REV. STAT. 742.061. Additionally, the Bank moves to amend the complaint to add a claim for breach of the contractual duty of good faith and fair dealing. Stewart Title opposes the motion to amend on the grounds that such amendment would prejudice Stewart Title, was not timely, and is futile. The court finds Stewart Title acted in accordance with the terms of the Policy and the proposed amendment to complaint would be futile. Accordingly, the Bank's motion to amend is denied and Stewart Title's motion for summary judgment is granted.[1]

*Preliminary Procedural Issue*

Stewart Title objects to the consideration of Exhibit 6 (the "Exhibit") attached to the declaration of Steven L. Naito. Stewart Title characterizes the Exhibit as part of settlement negotiations between the parties and argues it is inadmissible under FED. R. EVID. 408.

Rule 408 provides:

> **(a) Prohibited uses.** – Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> > (1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a pubic office or agency in the exercise of regulatory,

[1]The parties have consented to jurisdiction by magistrate in accordance with 28 U.S.C. § 636(c)(1).

> investigative, or enforcement authority.
>
> **(b) Permitted uses.** – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

FED. R. EVID. 408 (2011). The purpose behind Rule 408 is to foster the "promotion of the public policy favoring the compromise and settlement of disputes." FED. R. EVID. 408 advisory committee's note. Accordingly, Rule 408 does not apply when the parties were not engaged in the compromise or settlement of a dispute at the time the statements were made or the documents created.

Here, it is unclear why the Bank is offering the Exhibit, which consists of a few emails between the parties dated May 3 and May 4, 2011, in which the Bank attempts to open discussions to "resolve issues" and then demands the First Trust Deed be reconveyed before the foreclosure sale on May 10, 2011, and $50,000 in damages. In its opposition memorandum, the Bank refers to the Exhibit apparently as evidence that Stewart Title had knowledge of the Bank's position that Stewart Title had not fulfilled its indemnity obligation under the Policy as of May 4, 2011. (Pl.'s Mem. in Opp'n to Deft.'s Mot. for Summ. J. at 6.) In this context, it is clear the Exhibit is being used to show what Stewart Title knew on May 4, 2011, and is not being "offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Stewart Title makes no representations or admissions in the Exhibit – it only encourages the Bank to make an offer and suggests the parties get together to discuss a possible resolution of the issues. Therefore, the restrictions of Rule 408 do not apply to the Exhibit. Stewart Title's objections to the Exhibit are overruled.

*Background*

On March 6, 2008, the Bank loaned $3,000,000 to BAM Investments, LLC, (the "BAM Loan") secured by a trust deed (the "Trust Deed") on real property located in Clackamas County, Oregon (the "Property"). (Compl. ¶ 3.) In connection with the BAM Loan, the Bank purchased the Policy, which represented the Trust Deed was the only encumbrance against the Property and assured the Bank that the Trust Deed stood in first priority on the Property subject to minor exceptions such as taxes, water assessments, and agricultural liens, all of which were generally disclosed. (Compl. Ex. 1 at 10.) In fact, a prior encumbrance against the Property in the form of a trust deed securing a line of credit extended by Columbia State Bank ("Columbia") in the maximum amount of $1,000,000, dated March 17, 2006, had been recorded on April 13, 2006 (the "First Trust Deed"). (Compl. ¶ 5.)

In early October 2009, the Bank received notice Columbia had initiated judicial proceedings to foreclosure on the First Trust Deed, prompting the Bank to immediately file a claim with Stewart Title under the terms of the Policy. (Compl. ¶¶ 6-7.) By letter dated October 29, 2009, Stewart Title informed the Bank it accepted the foreclosure on the First Trust Deed "as a covered matter under the terms conditions of the policy of title insurance" and would retain counsel to defend the Bank's interest in the matter. (First Am. Answer Ex 1.)

In March 2010, BAM Investments, LLC, defaulted on the BAM Loan. (Naito Decl. Ex. 5 at 1.) On April 7, 2010, the Bank filed a notice of intent to nonjudicially foreclose on the Trust Deed and the sale of the Property was to scheduled to occur on August 25, 2010. (First Am. Answer Ex. 5.) Also in April 2010, the Bank entered into an agreement (the "April 2010 Agreement") to sell the BAM Loan, the Trust Deed, the Policy, and other related loan documents (the "BAM Loan

Documents") to 162 Investors LLC ("162 Investors") for the sum of $3,062,453.80, with 162 Investors making a $66,576.01 cash down payment and the Bank lending 162 Investors the remaining $2,995,877.87 (the "162 Investors Note"). (Sagalewicz Decl. Ex. 4.) 162 Investors agreed to pay all costs related to the foreclosure of the Trust Deed and the Bank agreed to bid all amounts due and owing under the BAM Loan at the foreclosure sale and, if successful, convey the Property to162 Investors simultaneously with the recording of a new trust deed executed by 162 Investors encumbering the Property as security for the Assignee Note. (Sagalewicz Decl. Ex. 4.)

Stewart Title elected to purchase the First Trust Deed to protect the Bank from loss resulting from the foreclosure of the prior encumbrance, rather than pay the Bank the decrease in value of the Property as a result of the existence of the prior encumbrance. Accordingly, the Bank entered into an Assignment and Assumption Agreement dated October 8, 2010, to purchase the line of credit, the First Trust Deed, and other forms of security for the line of credit, from Columbia for the sum of $1,174,259.97. (Rubin Decl. Ex. 1 at 1.)

The Bank's nonjudicial foreclosure of the Trust Deed, originally scheduled for August 25, 2010, but postponed due to the bankruptcy filing of one of the Property owners, was held on May 10, 2011. (Naito Decl. Ex. 5 at 2.) The Bank's credit bid of $3,684,342.79 was successful and the trustee recorded a Trustee's Deed conveying the Property to the Bank in satisfaction of the Loan on May 17, 2011. (First Am. Answer Ex. 7.)

On June 17, 2011, the Bank filed a complaint in state court asserting claims against Stewart Title for breach of the Policy, Unfair Claim Settlement Practices under OR. REV. STAT. 746.230, and for attorney fees under OR. REV. STAT. 742.061 (the "Complaint"). (Notice of Removal at 1-2, Ex. 1.) The Bank sought damages in the amount secured by the First Trust Deed or an order requiring

Stewart Title to record a release of the First Trust Deed, lost profits in the amount of $250,000, and reasonable attorney fees. (Compl. at 6.)

On June 27, 2011, the Bank and 162 Investors terminated the April 2010 Agreement. (Sagalewicz Decl. Ex. 6.) The parties then executed an Agreement of Purchase and Sale (the "June 2011 Agreement") in which the Bank agreed to sell the Property to 162 Investments in exchange for return of the Loan Documents. (Sagalewicz Decl. Ex. 6.) The 162 Investors Note was identified as partial consideration for conveyance of the Property and the guarantors of the 162 Investors Note agreed the guarantees would also remain in full force and effect with regard to the purchase of the Property. (Sagalewicz Decl. Ex. 6 at 2.) In the June 2011Agreement, the Bank represented it incurred $43,796.16 in attorney fees to foreclose the Trust Deed, a sum 162 Investors had agreed to pay under April 2010 Agreement. (Sagalewicz Decl. Ex. 6 at 2.) However, in the June 2011 Agreement, the Bank agreed to accept half that amount ($21,898.08) due to the delay in conveying title to the Property to 162 Investors as a result of the breach of the Policy by Stewart Title. (Sagalewicz Decl. Ex. 6 at 2.)

In the June 2011 Agreement, the sale of the Property was contingent on First American Title agreeing to issue a title insurance policy on the Property free and clear of all exceptions other than taxes, assessments, levies and liens, or public rights and easements. (Sagalewicz Decl. Ex. 6 at 2, 19-20.) If required by First American Title, the Bank agreed to execute an indemnification in favor of First American Title with regard to the First Trust Deed. (Sagalewicz Decl. Ex. 6 at 4.) On June 28, 2011, a statutory warranty deed (the "Deed") conveying the Property to 162 Investors free and clear of the First Trust Deed was recorded, along with a trust deed on the Property executed by 162 Investments in favor of the Bank as security for the 162 Investors Note (the "New Trust Deed").

(First Am. Answer Ex.'s 9, 10.)

On August 17, 2011, Stewart Title requested discovery with regard to the transactions between the Bank and 162 Investors relating to the Property. (First Am. Answer Ex. 11.) Stewart Title explained it needed the information to determine what obligations, if any, remained under the Policy and acknowledged that "subject to the effect of the [Policy] Exceptions, [Stewart Title] may be obligated to reconvey the deed of trust it presently holds on the Property." (First Am. Answer Ex. 11 at 2.)

After removing the Complaint to this court, Stewart Title executed and recorded a reconveyance of the First Trust Deed (the "Reconveyance") on February 22, 2012, and filed a motion for summary judgment in this action on the same day. (Rubin Decl. Ex. 2.) In the summary judgment motion, Stewart Title argued the Complaint should be dismissed because it had already provided the relief sought by the Bank by recording the Reconveyance and the Bank is not entitled to lost profits under the Policy or state law. In response, the Bank conceded the Reconveyance made moot its claims seeking performance of Stewart Title's obligations under the Policy and for unfair claim settlement practices, but argued it was still entitled to recover lost profits for breach of contract and for attorney fees under OR. REV. STAT. 742.061.

Shortly after filing its opposition to Stewart Title's summary judgment motion, the Bank moved to amend the Complaint to delete the moot claims and add a claim for breach of the duty of good faith and fair dealing in support of its breach of contract claim for lost profits (the "Proposed Complaint"). The Proposed Complaint alleges the Bank is entitled to recover $250,000 in damages for Stewart Title's breach of the Policy by failing to diligently remove the lien of the First Trust Deed and breach of its obligation of good faith by failing to reconvey the First Trust Deed in a timely

manner. (Pl.'s Mot. for Leave to File First Am. Compl Ex. 1 ¶¶ 15-19.) The Proposed Complaint also alleges a claim for attorney fees incurred by the Bank in enforcing its rights under the Policy pursuant to OR. REV. STAT. 742.061. (Pl.'s Mot. for Leave to File First Am. Compl Ex. 1 ¶¶ 20-23.)

In its reply brief, Stewart Title continued to argue the Bank was not entitled to recover damages for lost profits under either the terms of the Policy and was not entitled to recover attorney fees under OR. REV. STAT. 742.061. Additionally, Stewart Title argued the Bank had failed to support, with admissible evidence, its claim for lost profits based on changes in loss loan reserves and a decrease in the purchase price of the Property. Stewart Title opposed the Bank's motion to amend the Complaint, arguing that it had relied on the claims asserted in the Complaint in executing and recording the Reconveyance, the Bank unduly delayed in moving to amend the Complaint, and that the amendment is futile because the Bank is unable to recover the lost profits based on a claim for breach of the covenant of good faith and fair dealing.

In its sur-reply, the Bank clarifies its position and clearly states that:

> Plaintiff is seeking consequential damages for defendant's breach of the Title Policy by failing to diligently exercise its right to remove the CSB Trust Deed encumbrance from the Property. Plaintiff's damages arise from the defendant's failure to timely release the CSB Trust Deed. Plaintiff's damages from the failure of the defendant to timely release the CSB Trust Deed include, but are not limited to, increased loan loss expense and the reduction in the purchase price for the sale of the BAM Loan and the Property."

(Pl.'s Sur-Reply in Opp. To Def.'s Motion for Summ. J. at 2.)

*Legal Standard*

I. Summary Judgment

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a) (2010). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2010). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

II. Motion to Amend

Once a defendant has filed a responsive pleading – as is the case here – a plaintiff may amend his "pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a). Although the rule should be interpreted with "extreme liberality," *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981), leave to amend should not be granted automatically. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). A trial court may deny the motion if permitting amendment would prejudice the opposing party, produce an undue delay in litigation, result in futility for lack of merit, is sought by plaintiffs in bad faith or with a dilatory motive, or the plaintiffs have filed numerous amended complaints. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Prejudice to the opposing party carries the "greatest weight" in determining whether to deny leave to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Whether to grant leave to amend lies within the sound discretion of the trial court. *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). In exercising this discretion, however, the court "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Id.*

*Discussion*

I. Summary Judgment

*A. Lost Profits*

It is clear from the allegations of the Complaint and the Proposed Complaint, as well as the

Bank's briefing on the pending summary judgment motion, the Bank's claim for lost profits is based solely on Stewart Title's failure to reconvey the First Trust Deed for more than sixteen months, not on any alleged delay in purchasing the First Trust Deed. Accordingly, the first question that must be decided is whether Stewart Title was obligated under the Policy to not only purchase the First Trust Deed and remove the threat of foreclosure by Columbia, but also to reconvey the First Deed to the Bank so the Bank would have the first priority lien on the Property.

Under the Policy, Stewart Title agreed to insure the Bank "against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of: . . . (2) Any defect in or lien or encumbrance on the Title . . . [and] (3) Unmarketable Title." (Compl. Ex. 1 at 10-11.) "Unmarketable Title" is defined in the Policy as:

> Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring delivery of marketable title.

(Compl. Ex. 1 at 13.)

In the event the Bank initiated a claim against the Policy, Section 7 provided Stewart Title with the options of purchasing the Loan from the Bank or paying, or otherwise settling, with the Bank or third parties on behalf of the Bank. (Compl. Ex. 1 at 14.) Specifically, section 7(b)(i) of the Policy provided that Stewart Title could meet its obligations under the Policy by "pay[ing] or otherwise settl[ing] with other parties for or in the name of [the Bank] any claim insured against under this policy" as well as "pay[ing] any costs, attorneys' fees, and expenses incurred by the [Bank] that were authorized by [Stewart Title] up to the time of payment and that [Stewart Title] is obligated to pay." (Compl. Ex. 1 at 14.) In the event Stewart Title exercised this option, its

"obligations to the [Bank] under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation." (Compl. Ex. 1 at 14.) In addition to the options provided in section 7, the Policy, in section 5(b), gave Stewart Title the right:

> "at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the [Bank], as insured, or to prevent or reduce loss or damage to the [Bank]. [Stewart Title] may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If [Stewart Title] exercises its rights under this subsection, it must do so diligently."

(Compl. Ex. 1 at 13.) Section 9 of the Policy, entitled "Limitation of Liability" provides that:

> (a) If [Stewart Title] establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the [Trust Deed], all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damages caused to the [Bank].
>
> (b) In the event of any litigation, including litigation by [Stewart Title] or with [Stewart Title's] consent, [Stewart Title] shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as Insured.
>
> (c) [Stewart Title] shall not be liable for loss or damage to the [Bank] for liability volunteered assumed by the [Bank] in settling any claim or suit without the prior written consent of [Stewart Title].

(Compl. Ex. 1 at 15.)

Title insurance policies are contracts of indemnity and not of guaranty. *Miller v. Ticor Title Ins. Co.*, 194 Or. App. 17, 21 (2004). The insurer does not guaranty that title to the property is in any particular condition, but rather agrees to indemnify, or hold harmless, the insured from any loss

suffered as a result of defects in the title not excepted by the insurer. Accordingly, absent a loss suffered by the insured as a result of such defects, the insurer has no obligation to pay benefits under a title insurance policy. *Id. See also Chicago Title Ins. Co. v. Seko Inv., Inc.*, 156 F.3d 1005, 1007 (9th Cir. 1998)(citing *Karl v. Commonwealth Land Title Ins. Co.*, 20 Cal. App. 4th 972, 978 (1993)). In the context of a title insurance policy issued to a lender, the lender suffers an indemnifiable loss only if the lender is unable to recover the full amount of the insured debt as a result of the insured-against senior liens. *Karl*, 20 Cal, App. 4th at 978.

Here, the Bank's ability to recover the full amount of the Loan was put into jeopardy when Columbia initiated foreclosure proceedings on the First Trust Deed. Stewart Title accepted the First Trust Deed as covered under the Policy, defended the Bank's interest in the foreclosure proceeding and, ultimately, purchased the First Trust Deed, thereby eliminating the First Trust Deed as a barrier to the Bank's ability to recover the full amount of the Loan through its security – the Property. At this point, Stewart Title had performed its obligations under the Policy, as evidenced by the Bank's subsequent purchase of the Property at foreclosure on May 10, 2011, for a credit bid representing the entire amount then due and owing under the Loan. The Bank was able to foreclose on the Property as though the First Trust Deed did not exist and was under no obligation to pay Stewart Title the amount secured by the First Trust Deed.

Stewart Title's obligation to reconvey the First Trust Deed under the Policy to provide marketable title as required by the Policy, if any, did not exist until the Bank attempted to sell the Property after purchasing it at foreclosure. Initially, the Bank agreed to sell the BAM Loan Documents to 162 Investors and to finance this sale with a loan to 162 Investors. At this point, it appears 162 Investors had no issue with the First Trust Deed. Both parties performed their duties

under the April 2010 Agreement. 162 Investors paid $3,062,453.80 for the BAM Loan Documents in the form of $66,576.01 in cash and the $2,995,877.87 162 Investors Note, all guaranteed by three individual guarantees. Additionally, 162 Investors made payments under the Note. The Bank loaned the money to 162 Investors to purchase the Loan Documents, transferred the Loan Documents, and made a credit bid for the amount of the outstanding indebtedness on the BAM Loan at foreclosure. The April 2011 Agreement does not reveal, and the Bank does not allege, that the purchase price of the BAM Loan Documents was affected in any way by the existence of the First Trust Deed held by Stewart Title. Accordingly, as of the date of the Bank's purchase of the Property at the foreclosure sale, when all that remained to do under the April 2010 Agreement was the transfer of the Property to 162 Investors and the payment of the Bank's foreclosure costs by 162 Investors, the Bank had not suffered an injury as a result of Stewart Title's failure to reconvey the First Trust Deed and, therefore, did not have a viable claim against the Policy.

The only possible claim for breach of the Policy based on the failure to timely reconvey the First Trust Deed accrued at the time the Bank voluntarily terminated the April 2010 Agreement, entered into the June 2011 Agreement, and agreed to discount the price of the Property by $21,898.08 as a result of 162 Investors newly raised concerns over the existence of the First Trust Deed. The Bank's concession on the recovery of its foreclosure costs in response to 162 Investors' dissatisfaction because of the continuing existence of the First Trust Deed as a superior encumbrance on the Property could qualify as a defect in title that would allow 162 Investors to be released from its obligation to purchase the Property under the June 2011 Agreement requiring marketable title. Accordingly, the Bank would, arguably, have a claim against Stewart Title under the Policy for based on loss caused by unmarketable title. However, under the facts currently before the court, the claims

alleged in the Complaint based on loss caused by the failure to reconvey the First Trust Deed are not well taken.

First, the court notes the statutory warranty deed transferring the Property from the Bank to 162 Investors, and the title insurance policy issued on the Property by First American Title to 162 Investors, do not list the First Trust Deed as an exception. These documents appear to establish the Bank held marketable title to the Property which would defeat any claim the Bank made against the Policy for unmarketable title.

Second, as discussed above, any claim the Bank may have had under the Policy for losses related to marketable title based on the failure to reconvey the First Trust Deed did not arise until the June 2011 Agreement was signed on June 27, 2011. The Bank did not suffer a loss until the June 2011 Agreement was signed, at which time the Bank lost nearly $22,000 allegedly because of the condition of title to the Property. Accordingly, as of the date the Complaint was filed, on June 17, 2011, the Bank had not suffered any loss and Stewart Title had no obligation under the Policy to reconvey the First Trust Deed.

Third, the decrease in the purchase price of the Property was caused primarily, if not solely, by the Bank's voluntary decision to terminate the April 2010 Agreement, under which 162 Investors remained obligated to pay the full amount of the Bank's foreclosure costs in exchange for the transfer of the Property. If, as indicated by the Bank, the termination of the April 2010 Agreement and the lowering of the purchase price was a concession to 162 Investors based on the delay in closing resulting from Stewart Title's failure to reconvey the First Trust Deed, such actions were in the form of a settlement. The Policy specifically provides that Stewart Title "will not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim

or suit without the prior written consent of the [Stewart Title]". The Bank's decision to relieve 162 Investors from their obligations under the April 2010 Agreement, to enter into the June 2011 Agreement, and to accept less than the full amount of its foreclosure costs is a voluntary decision not covered under the terms of the Policy. Therefore, any losses suffered by the Bank as a result of its concession to 162 Investors is not a covered loss and State Farm was under no obligation to reconvey the First Trust Deed to prevent such loss.

Finally, Stewart Title had no obligation to reconvey the First Trust Deed before the Bank informed them it had suffered, or was likely to suffer, a loss based on the unmarketability of the Property. Section 3 of the Policy provides that "[t]he Insured shall notify [Stewart Title] promptly in writing . . . if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title." There is no evidence that the Bank advised Stewart Title it was attempting to sell the Property prior to executing the June 2011 Agreement, that 162 Insurance was expressing dissatisfaction with marketability of the Property, or that the Bank was agreeing to a decrease in price as a concession based on unmarketable title. Consequently, the Bank failed to make a claim under the Policy in a timely manner. Had the Bank informed Stewart Title of the pending sale and the likely terms of the June 2011 Agreement, Stewart Title would have had the opportunity to reconvey the First Trust Deed before the Bank suffered any loss. The Bank's apparent failure to advise Stewart Title of the impending loss deprived Stewart Title of its rights under the Policy to settle with third parties. Therefore, Stewart Title had no obligation to reconvey the Trust Deed and its failure to do so before the June 2011 Agreement was executed was not dilatory.

The Bank did not suffer any loss as a result of the unmarketable title to the Property prior to June 27, 2011, the date the June 2011 Agreement was executed. Accordingly, Stewart Title had no

obligation to reconvey the First Trust Deed as of June 17, 2011, the date the Complaint was filed. Additionally, because the Bank entered into a settlement with 162 Investors with regard to a concession on price based on concerns over title to the Property and failed to timely notify Stewart Title in writing of 162 Investors concerns, the Bank did not comply with Policy requirements and is unable to assert a claim against the Policy. The court finds Stewart Title was under no obligation to reconvey the First Trust Deed at the time the Complaint was filed or before the June 2011 Agreement was signed.

*B. Attorney Fees*

The Bank seeks to recover attorneys fees incurred in its attempt to enforce its rights under the Policy – specifically to force Stewart Title to reconvey the First Trust Deed and to recover the lost profits. The Bank asserts it has a right to recover attorney fees under OR. REV. STAT. 742.061 which provides, in pertinent part, that:

> if settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy or insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon.

The Oregon Supreme Court has consistently held that to secure attorney fees pursuant to OR. REV. STAT. 742.061, "the insured must recover a money judgment against the insurer." *McGraw v. Gwinner*, 282 Or. 393, 400 (1978). Here, the court finds Stewart Title is entitled to summary judgment on the Bank's sole remaining claim for breach of contract and is not liable to pay the Bank any amount of damages. In the absence of a money judgment against Stewart Title, the Bank is not entitled to attorney fees incurred in pursuing its claims against Stewart Title. Stewart Title is entitled

to summary judgment on the Bank's claim for attorney fees as well.

II. Motion to Amend

The Bank moves to amend the Complaint primarily to allege a claim for breach of the contractual duty of good faith and fair dealing in addition to its breach of contract and attorney fees claims. Stewart Title opposes the motion asserting it would be prejudiced by the amendment in that it relied on the claims asserted in the Complaint in executing and recording the Reconveyance, the Bank unduly delayed in moving to amend the Complaint, and the proposed amendment is futile in that the Bank is unable to recover the lost profits based on a claim for breach of the covenant of good faith and fair dealing.

The court has already determined Stewart Title had no obligation to reconvey the First Trust Deed. This finding clearly defeats the breach of contract claim asserted in the Complaint. While a party to a contract may violate the duty of good faith and fair dealing without also breaching the express provisions of the contract, *McKenzie v. Pac. Health & Life Ins. Co.*, 118 Or. App. 377, 381 (1993), such is not the case here. The Bank's claim for breach of the duty of good faith and fair dealing, as is its claim for breach of contract, is based on Stewart Title's failure to reconvey the First Trust Deed in a timely manner. The determination that Stewart Title had no duty to reconvey the First Trust Deed defeats the Bank's good faith and fair dealing claim as well as its breach of contract claim. Accordingly, any attempt to amend the Complaint to add a claim based on Stewart Title's bad faith in failing to timely reconvey the First Trust Deed would be futile. The Bank's motion to amend the Complaint is denied.

*Conclusion*

Stewart Title's motion (#20) for summary judgment on the claims asserted by the Bank in

the Complaint is GRANTED. The Bank's motion (#29) to amend the Complaint is DENIED.

DATED this 17th day of July, 2012.

JOHN V. ACOSTA
United States Magistrate Judge